HARTFORD FIRE INSURANCE COMPANY v. STATE.

Opinion delivered July 15, 1905.

1. ANTI-TRUST ACT—FOREIGN INSURANCE COMPANY—RIGHT TO DO BUSINESS IN STATE.—The act of January 23, 1905, provides, *inter alia,* that any corporation which shall enter into or become a member of or party to any pool, trust, agreement, combination, confederation or understanding, whether made in this State or elsewhere, with any other corporation, partnership or individual to regulate or fix in this State or elsewhere the premium to be paid for fire insurance shall be guilty of a conspiracy to defraud, and be subject to the penalties provided by the act. *Held,* that the act prohibits a foreign insurance corporation from doing business in Arkansas while a member of a pool, trust, or combination to fix fire insurance rates anywhere,

although such pool, trust, or combination is not created or maintained in Arkansas, and does not attempt to fix rates in this State. (Page 305.)

2. FOREIGN INSURANCE COMPANIES—RIGHT OF STATE TO EXCLUDE.—The Legislature may constitutionally enact that foreign insurance corporations shall not do business within the State if they are members of any pool, trust, or combination, entered into in this State or elsewhere, to affect insurance rates anywhere in the world.   (Page 307.)

Appeal from Pulaski Circuit Court, Second Division.

EDWARD W. WINFIELD, Judge.

Affirmed.

The State brought this action against the Hartford Fire Insurance Company, and alleged that defendant was an insurance corporation organized under the laws of Connecticut, and on January 23, 1905, and on March 25, 1905, transacting and conducting the business of insuring property in this State, and was a member of and party to a pool, trust, agreement, combination, confederation and understanding with other insurance corporations to regulate and fix the price and premium to be paid for insuring property against loss and damage by fire, lightning and tornadoes; that on the 27th day of March, 1905, while a member of and party to such pool, etc., defendant conducted in Pulaski County, in this State, the business of insuring property against loss and damage by fire, lightning and tornado, and while then and there transacting and conducting such business was, on the 27th day of March, 1905, a member of, and party to, such pool, etc., contrary to the statute; wherefore judgment was prayed that defendant's right to do business in the State be forfeited, and that plaintiff recover the sum of $5,000.

Defendant filed a motion to require the plaintiff to make the complaint more specific, in this,

"First, that the complaint should allege whether the defendant was a member of and party to such pool, trust, agreement, etc., in this State or without the limits of the State.

"Second, that the complaint should allege whether the being a member of, and a party to, such pool, trust, agreement, etc., was to fix and regulate the price and premium to be paid for insuring property in this State or without the limits of the State.

"Third, that the complaint should allege specifically as to which one of the several combinations mentioned the defendant belonged."

The motion was overruled, and defendant answered, alleging that it is not, and was not, a member of, or party to, any pool, etc., made and entered into in this State, to regulate or fix the price or premium to be paid for insuring property anywhere, and that it was not on the dates mentioned in the complaint nor at any time since the passage of the act a member of, or party to, any pool, etc., made and entered into in the State or elsewhere to fix or regulate the price or premium to be paid for insuring property in this State against loss or damage by fire, lightning or tornadoes, or which in any manner affected or affects the price or premium to be paid for insuring property within the State.

It was agreed between the parties that, in the event defendant's answer herein should be held or adjudged insufficient as a defense to plaintiff's action, judgment shall at once be rendered in the circuit court in plaintiff's favor against defendant for recovery of a penalty of $200 and costs, and that if said judgment is not reversed by the Supreme Court of Arkansas, the penalty and costs, including costs in said Supreme Court, should be paid by defendant upon the determination of said cause in said Supreme Court of Arkansas, and that defendant was to take no appeal from the Supreme Court of Arkansas in this cause.

A demurrer to the answer was sustained, and defendant appealed.

*J. W. & M. House,* for appellant; *J. M. Moore & W. B. Smith, Morris M. Cohn* and *Ashley Cockrill,* of counsel.

*Robert L. Rogers, Attorney General,* for appellee; *W. L. Terry, W. M. Lewis* and *Lewis Rhoton,* of counsel.

HILL, C. J.  On the 6th of March, 1899, the General Assembly passed an act, commonly called the "Rector Anti-Trust Act." It was construed by this court in *Lancashire Insurance Company* v. *State,* 66 Ark. 466, and is found in sections 1976-1982, Kirby's Digest.

On the 23d of January, 1905, an act repealing this act and "providing for the punishment of pools, trusts and conspiracies to control prices, and as evidence and prosecution in such cases,"

was approved. This is a prosecution instituted by the State under the latter act against the appellant, which is a foreign insurance corporation, for doing an insurance business in the State without complying with the provisions of said act of 1905. The Reporter will set forth the issues framed by the pleadings and the agreed statement of facts. The circuit court held the appellant liable to the penalty of the act, and gave judgment accordingly, and the appellant brings the case here, and it involves the construction of the act.

The defining and controlling part of the act is found in the first section thereof. The body of the first section is a copy of the first section of the Rector act, with certain words and phrases inserted therein. It is here given with the inserted words and phrases placed in brackets, so that the eye may detect the additions to the Rector act:

"Section 1. Any corporation organized under the laws of this or any other State, or country, and transacting or conducting any kind of business in this State, or any partnership or individual, or other association or persons whatsoever, who [are now, or] shall [hereafter] create, enter into, become a member of, or a party to, any pool, trust, agreement, combination, confederation or understanding, [whether the same is made in this State or elsewhere], with any other corporation, partnership, individual, or any other person or association of persons, to regulate or fix [either in this State or elsewhere] the price of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, any product of mining, or any article or thing whatsoever, or the price or premium to be paid for insuring property against loss or damage by fire, lightning or tornado, or to maintain said price when so regulated, or fixed, [or who are now], or shall [hereafter] enter into, become a member of, or a party to any pool, agreement, contract, combination, association or confederation, [whether made in this State or elsewhere], to fix or limit, [in this State or elsewhere,] the amount or quantity of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, any product of mining, or any article or thing whatsoever, or the price or premium to be paid for insuring property against loss or damage by fire, lightning, storm, cyclone, tornado, or any other kind of policy issued by any corporation, partner-

ship, individual or association of persons aforesaid, shall be deemed and adjudged guilty of conspiracy to defraud and be subject to the penalties as provided by this act."

Other sections are added to the act not contained in the Rector act, but all of the sections of the Rector act are retained, the only changes in them being that clauses are inserted where necessary to make the other parts conform to the first section. These new sections throw no light on the construction, and are not involved in this case.

These are the questions involved:

1. Does the act prohibit, under the penalty named therein, a foreign insurance corporation from doing business in Arkansas while such corporation is a member of a pool, trust or combination to fix insurance rates anywhere, although such pool, trust. or combination is not created or maintained in Arkansas, and does not affect or fix, or attempt to do so, rates of insurance in Arkansas? To state the proposition by illustration: Assume that the appellant is a member of a trust—called a rating bureau—created and maintained in New York City to fix insurance rates in New York City and St. Petersburg, but which does not fix or affect rates in Arkansas, is it guilty of a violation of the act if it transacts an insurance business in Arkansas upon complying with all the statutes of this State except the one at bar?

2. If the act reaches to and makes unlawful the transaction of an insurance business in Arkansas by a foreign insurance corporation while belonging to a trust, pool or combination to fix or affect rates in other places than Arkansas, but not in Arkansas, is the act constitutional, and is it within the power of the State to enact it?

1. The State contends for the affirmative of both propositions above stated, the appellant for the negative. The insurance company contends that the act renders unlawful the doing of business in this State by a foreign corporation while it belongs to a trust or pool made in this State or elsewhere to regulate or fix the rates of insurance on property in this State. It admits that it belongs to a trust, within the definition of the act, but says that such trust is created and maintained without the State to fix prices at places without the State, and that it does not belong to such trust created or maintained anywhere to fix or affect insur-

ance rates on property within this State. These different constructions have been pressed upon the court in strong and plausible oral arguments and in able and exhaustive briefs, and the court has laboriously and painstakingly examined, discussed and deliberated upon the arguments presented by counsel.

If the act itself was clearly and properly drawn, and free of obscurity and ambiguity, this case would not, in all probability, be here, or, if perchance it were, the work of the court would have been easily and speedily done, for it is elemental that the act itself furnishes its construction; or, rather, when it is plain there is nothing to construe. The law on that subject is thus stated: "The statute itself furnishes the best means of its own exposition; and if the intent of the act can be clearly ascertained from reading its provisions, and all its parts may be brought in harmony therewith, that intent will prevail, without resorting to other aids for construction." 2 Lewis' Sutherland on Stat. Con. § 348. Therefore the first duty of the court is to ascertain, if it can, from the act itself the intent of the law-makers, and when that is found then declare it; and the act is enforced as so declared, if otherwise valid.

The first matter to attract attention is the connection in which the words "in this State or elsewhere" are inserted into the body of the Rector act. The first connection is descriptive of "the pool, trust, agreement, combination, confederation or understanding" (hereafter for brevity's sake this clause will be called a "trust"), "whether made in this State or elsewhere." The second connection is with the persons confederating to regulate or fix, "either in this State or elsewhere," prices, etc. The third connection is with the trust, "whether made in this State or elsewhere," "to fix or limit in this State or elsewhere" the amount or quantity of production, the rates or premiums of insurance, etc. These terms should qualify the clauses to which they are annexed grammatically and in fact, if possible. When so considered, they indicate that they refer to the trust made in this State or elsewhere to regulate prices, either in this State or elsewhere, or to become a member of a trust to fix or limit production (or prices) in this State or elsewhere, and not merely doing business in this State under a trust agreement created in this State or elsewhere to fix prices in this State.

To construe the act as making unlawful alone the doing of business in this State while a member of a trust fixing prices in this State, though the trust might be made elsewhere to fix prices here, would be rendering unnecessary and meaningless these words "in this State or elsewhere," so often used, for the Rector act was construed to be just such an act as this would then be. The natural construction is to make the doing of business in this State while a member of a trust formed anywhere to regulate prices anywhere unlawful. This gives full force to each word and phrase employed, eliminates none, and creates nothing by implication or construction, but gives force and effect to each and every part of the section, and that is a primary duty in construction. 2 Lewis' Sutherland, Stat. Const. § § 368, 369. While the foregoing seems the natural construction of the act, yet the plausibility and force with which the other has been pressed, and the fact that members of this court see in it yet another construction, calls for hesitation and doubt as to the true construction to be placed upon it from the language alone. In such cases it is the duty of the court to turn to the "history of the times" to collect the intention of the Legislature from the occasion or necessity of the law; "from the mischief felt, and objects and remedy in view."

To ascertain the legislative intention, the courts must look to public events which are sufficiently notorious to be known to all men of reasonable information; to public documents, executive messages, proclamations and recommendations; to legislative proceedings and journals, but not to individual views, votes or speeches of legislators; to the result of elections and political issues therein determined; to a well-defined and crystallized public sentiment, when so notorious as to be part of the well-known events of the day. In short, the courts may, and, when the statute is not clear, must, take cognizance of the trend of public events which make the "history of the times," in so far as the same touches or furnishes the moving cause for the statute under review. These principles are well established. 2 Lewis' Sutherland on Stat. Con. § § 462, 470, 471; 1 Elliott, Evidence, § § 53, 59, 65, 67; *U. S.* v. *Union Pac. Ry. Co.* 91 U. S. 72; *U. S.* v. *Trans-Missouri Freight Assn.* 166 U. S. 290; *Redell v. Moores,* 63 Neb. 219; *State* v. *Schoonover,* 135 Ind. 526; *State* v. *Downs,*

148 Ind. 324; *Stout* v. *LaFollette,* 64 Ind. 553; *Prince* v. *Skillin,* 71 Me. 361, 36 Am. Rep. 325; *Swinnerton* v. *Columbian Ins. Co.* 37 N. Y. 188.

Turning then, under the requirement of the law, to the "history of the times," derived from the sources mentioned, these facts throw light on the act:

When the Rector act was before the court in *Lancashire Ins. Co.* v. *State,* 66 Ark. 466, the court thus stated the contentions of the respective parties: "The Attorney-General contends that no insurance company, while a member of a trust or combination to fix rates in any part of the world, can do business here, without becoming liable to a penalty under our statute. The defendant, on the other hand, denies that the language of the statute in question carries the meaning contended for by the Attorney-General, and the question before us has reference, not to the power of the Legislature, for that is conceded—but to the proper construction and meaning of the statute." The court then fully discussed the contentions and the act, and reached this conclusion: "Our conclusion is that this statute does not apply to pools or combinations formed outside of this State, and not intended to affect, and which do not affect, persons, property, or prices of insurance in this State. In other words, we are of the opinion that the Legislature by this act did not intend to prohibit or punish acts done or agreements made in foreign countries by corporations doing business here when such acts or agreements have reference only to persons, property or prices in such foreign countries."

When the court failed to construe the Rector act as contended for by the Attorney-General, he dismissed all prosecutions which had been instituted under it, and the act has since then been but an incumbrance on the statute book. The next General Assembly following this decision, that of 1901, had before it a bill called the "King bill," which was generally supposed to embody into law the views pressed upon the court by the State in the Lancashire case. This bill was defeated in 1901, and again in 1903. In 1904 the dominant political party in this State, through its party platform, demanded of the next General Assembly the passage of the King Bill, and of the purpose of said bill said:"

"Whereby all foreign corporations shall be prevented from doing business in this State if they are members of any trust, pool,

combination or conspiracy against trade, whether such trust, pool, combination or conspiracy affects, or is intended to affect, prices or rates in Arkansas or not." The General Assembly elected in 1904, composed almost entirely of members of the political party whose platform is quoted, with remarkable unanimity and rapidity, passed the King bill, which had been rejected by the two preceding General Assemblies, and in less than a fortnight of its organization it was approved, and it is the statute now at bar. Reaching back to the construction sought by the State in the Lancashire case, an act is now before the court supposed to embody that theory, demanded by the dominant party as containing it, and speedily passed by the General Assembly elected on the platform demanding it. These facts render the conclusion irresistible that the General Assembly intended to render unlawful the doing of business in this State by any corporation when such corporation belonged to any trust to fix prices anywhere, when it passed this act. Whether the moving cause for this demand was wise or foolish, whether the act will promote the general welfare or bring wreck and disaster in its enforcement, are questions with which the courts cannot deal. These questions are addressed to the other departments of the government; and when the intention of the law-makers is discovered, either in the language employed or from the language aided by a search into the intention from the history of events, the duty of the court is plain. When this history is considered in connection with the language used in the act, then the ambiguity, uncertainty and obscurity resulting from the confused terms of the statute are cleared away, and the construction heretofore indicated made certain to be the construction intended, and such construction is conformable to the language employed, and not in violence to any part of it. It being plain that the General Assembly intended by this act to subject to the penalty of it any foreign corporation doing business in this State while a member of a trust formed to fix prices anywhere, it remains to consider the constitutionality of it.

2. In *Lancashire Ins. Co.* v. *State*, 66 Ark. 466, the court, in construing the Rector act, said: "As the Legislature has the power to entirely exclude foreign insurance companies from doing business in this State, it can, of course, dictate the terms upon which such companies may do business here. The whole

matter rests in the discretion of the Legislature." This act requires every corporation doing business in this State to annually make affidavit that it does not belong to any trust described in the first section of it to fix prices in this State or elsewhere; provides for prosecutions against them for a failure to make such affidavit and for the right to do business to be forfeited; and in other ways clearly indicates that it shall be unlawful to do business in this State while belonging to a trust to fix prices anywhere. It gave sixty days to corporations then doing business to come within its terms, and thereafter it was unlawful to transact any business in the State while maintaining a membership in a trust anywhere to fix prices anywhere. In the language of the Lancashire case, the State has dictated these terms upon which foreign insurance companies can do business in this State. Limiting the decision entirely to the facts before the court, it is held that the State has declared, and possesses the right to declare, that foreign insurance corporations cannot do business in this State while belonging to a pool, trust, combination, conspiracy or confederation to fix or affect insurance rates anywhere.

The judgment is affirmed.

BATTLE, J., (dissenting.) I do not agree with the court as to the construction of the act in question.

The title of the act is "An act providing for the punishment of pools, trusts and conspiracies to control prices, and as evidence and prosecution in such cases." If the act is ambiguous, it (the title) can be considered for the purpose of construing it. Cooley's Constitutional Limitations (7 Ed.), 202.

The first part of section 1 of the act enumerates those to whom it applies as follows: "Any corporation organized under the laws of this or any other State, or country, and transacting or conducting any kind of business in this State, or any partnership or individual or other association or other persons whatsoever."

The remainder of the section specifies the acts it makes a crime, and is as follows: "Who are now, or shall hereafter create, enter into, become a member of, or a party to, any pool, trust, agreement, combination, confederation or understanding, whether the same is made in this State or elsewhere, with any other corpo-

ration, partnership, individual, or any other person or association
of persons, to regulate or fix, either in this State or elsewhere, the
price of any article of manufacture, mechanism, merchandise,
commodity, convenience, repair, any product of mining, any arti-
cle or thing whatsoever, or the price or premium to be paid for
insuring property against loss or damage by fire, lightning, or
tornado, or to maintain said price when so regulated or fixed, or
who are now or shall hereafter enter into, become a member of,
or a party to any pool, agreement, contract, combination, associa-
tion or confederation, whether made in this State or elsewhere,
to fix or limit, in this State or elsewhere, the amount or quantity
of any article of manufacture, mechanism, commodity, conven-
ience, repair, any product of mining, or any article or thing what-
soever, or the price or premium to be paid for insuring property
against loss or damage by fire, lightning, storm, cyclone, tornado
or any other kind of policy issued by any corporation, partner-
ship, individual or association of persons aforesaid, shall be
deemed and adjudged guilty of a conspiracy to defraud and be
subject to the penalties as provided by this act." The acts made
penal consist *solely* of the creating, entering into, becoming a
member of, or a party to any pool, trust, agreement, combination,
confederation or understanding, whether the same is made in this
State or elsewhere, with any other corporation or association of
persons, to regulate or fix, either in this State or elsewhere, prices
of articles and things and premiums for insurance. It is insisted
that doing business in this State after the formation of such
pools, trusts and combinations is made necessary to constitute the
offense. The name given to the offense indicates that this is not
true. It is called a conspiracy to defraud. Again, the words
*transacting or conducting business,* used in this section of the act,
are not used in connection with, and do not apply to, partnerships,
individuals, associations or persons, any more than the words
"organized under the laws of this or any other State or country,"
used in the same connection, and are obviously not elements of the
offense when committed by those classes. To make the transact-
ing or doing business necessary to constitute the offense when
committed by a corporation, and unnecessary when committed by
individuals, partnerships and associations, would make it neces-
sary to place upon the same words two different constructions,—

a construction which would make the act unreasonable and absurd. The Legislature certainly did not intend that the ingredients of the crime should be different when committed by individuals, partnerships, and associations and when committed by corporations. Why should the transacting or conducting of business be treated as a part of the offense or conspiracy in one case and not in the other? There is no reason, and there is nothing in the act, as I understand it, to indicate that such was intended; and it cannot be made to do so without transposing the words "transacting or conducting any kind of business in this State" to another part of the section and adding other words—something that cannot lawfully be done by the courts. Those words, "transacting or conducting any kind of business in this State," like the words, "organized under the laws of this or any other State or country," used in the same connection, are *descriptio personae,* and the former are used to confine the operation of the act to such corporations as are going, "and not defunct, dead concerns, out of business, and, for all practical purposes, out of existence."

Sections two and three of the act make the offense defined in the first section punishable by a fine of not less than $200 nor more than $5,000 for each day the offense is continued, and, if the offender be a foreign corporation, by the forfeiture of its right and privilege thereafter to do any business in this State. The effect of the act, if valid, is to make certain acts done outside of this State penal offenses, punishable by fine and forfeiture, which is beyond the power of the Legislature. To that extent, at least, the act is void, and of no effect.

The judgment of the circuit court, I think, should be reversed, and the demurrer to the appellant's answer should be overruled.

WOOD, J., (dissenting.) Nowhere in this act has the Legislature made the mere innocent act of doing business in this State, without reference to prices fixed by a trust, a crime. They have not made it unlawful for foreign corporations, who are in a trust here or elsewhere, to do business in this State, provided such business has no connection with a trust or trust prices. They have nowhere prohibited such innocent acts of doing business. Until this is done, it is palpably wrong for the court to invoke the aid of the "history of the times" or the mandates of political plat-

forms or executive messages, or any other extraneous matters, to ascertain the intent of the Legislature. No rules of construction are better settled than that crimes will not be created by intendment or implication, and that penal statutes must be strictly construed. As early as the Sixth Arkansas this court said: "It is a rule never to be departed from that criminal statutes must be strictly construed. The rule is founded alike upon policy as well as humanity, designed for the protection of the citizen; unless he is clearly charged and proved guilty of a *positive* enactment of law," he cannot be punished. *Hughes* v. *State*, 6 Ark. 134.

In *Stout* v. *State*, 43 Ark. 415, this language was used: "Penal statutes in declaring what acts shall constitute an offense, and in prescribing punishment to be inflicted, are to be construed rigorously. The general words shall be restrained for the benefit of him against whom the penalty is inflicted. The case of an offender must fall within the words and the mischief to be remedied." In *Casey* v. *State*, 53 Ark. 336, Chief Justice COCKRILL said: "No case should be brought within a penal statute unless completely within its words, and every reasonable doubt about the meaning of the language should be resolved in favor of the accused."

In *State* v. *Lancashire Ins. Co.*, 66 Ark. 466, Judge RIDDICK said: "To determine the meaning of a statute, the courts must look mainly to the language of the act itself, for that is the final expression of the legislative will, and therein must such will and intention be sought. Whatever the Legislature may have intended, such intention can have no effect unless expressed in the statute; for this, being a penal statute, cannot be extended by implication. It would be in the highest degree unjust to punish conduct not clearly forbidden by the law itself, and, to quote the words of a recent opinion of the Supreme Court of the United States: "We are left to determine the meaning of this act as we determine the meaning of other acts from the language used therein." *United States* v. *Trans-Mississippi Freight Assn.*, 166 U. S. 318. Again this court, through the same learned judge, in *Little Rock & F. S. Ry. Co.* v. *Oppenheimer*, 64 Ark. 271, 289, speaking of a penal statute, said: "It shows that the language of the statute does not plainly express what appellees say it means. But this is a penal statute, and cannot be extended by implica-

tion. * * * The statute should not, of course, be defeated by a forced or overstrict construction; but the intention of the Legislature must be gathered from the words, and they must be such as to leave no reasonable doubt upon the subject." *Berry* v. *Ry. Co.* 41 Ark. 517; *Watkins* v. *Griffith,* 59 Ark. 344-356; *Basham* v. *Toors,* 51 Ark. 309-315; *Little Rock, H. S. & T. Ry. Co.* v. *Spencer,* 65 Ark. 183. These excerpts, out of many to be found in our reports from the first to the last, of same purport, show how tenaciously this court has adhered to these fundamental rules of construction. Indeed, so important are they in conserving personal liberty and the rights of property they have always been considered as inviolable as the Constitution itself.

To the everlasting credit of this high tribunal, not a single case can be found, so far as I am aware, where these rules have ever been departed from. Why should we ignore them now? In the opinion of the majority, after reciting that the dominant political party in this State in its platform had demanded the passage of the King bill, and after quoting what the convention construed to be the purpose of the bill, Chief Justice HILL continues as follows: "The General Assembly elected in 1904, composed almost entirely of members of the political party whose platform is quoted, with remarkable unanimity and rapidity, passed the King bill, which had been rejected by the two preceding General Assemblies, and in less than a fortnight of its organization. it was approved, and it is the statute now at bar. Reaching back to the construction sought by the State in the Lancashire case, an act is now before the court supposed to embody that theory, demanded by the dominant party as containing it, and speedily passed by the General Assembly elected on the platform demanding it; these facts render the conclusion irresistible that the General Assembly intended to render unlawful the doing of business in this State by any corporation when such corporation belonged to any trust to fix prices anywhere, when it passed this act."

In view of what I have already said, I submit that no consideration whatever should be given to the demands of a partisan organization in arriving at the proper meaning of this act, especially when the Democratic convention approved the King bill exactly in the words as written to carry out its expressed purpose. To follow such a recommendation as that would be for this court

to yield the authority vested in it by the Constitution and the laws to the behests of a political convention.

But, if matters extraneous to the language of the act itself must be looked to, then I protest that it would be more in keeping with the dignity, authority and independence of this court, and less derogatory to the Legislature, to say that, having the decision of this court before them construing the former law, they were guided and controlled by the principles and rules therein announced, rather than by the demands of any party platform, or any executive message. For, if not, we must impeach them either of imbecility of mind or worse. If, as the majority intimates, this legislation, in the unconstitutional and therefore vicious form upheld by this court, is in response to the demands of the dominant political party in this State, as evidenced by the "remarkable unanimity and rapidity" with which it was passed by the Legislature "elected on the platform demanding it," then I feel constrained to say that this is all the greater reason why this court should observe those time-honored rules of construction which have been formulated by the ministers of justice through all ages, and are found to be wise and useful canons at all times for the preservation of the sacred rights of personal liberty and property, and especially useful in times of great political excitement and craze in saving the people themselves from the evil result of their own ignorance or folly, and ofttimes from the wicked designs of selfish and unscrupulous politicians.

Attributing then to the Legislature only a desire to observe these well-known rules of construction, which were announced by this court in passing upon the Rector law in the decision which they had before them, and only a desire to conform their last enactment to the Constitution, as they were sworn to do, I shall proceed from that viewpoint to discuss the construction that should be given the present anti-trust law upon the case presented by this record.

First. *As to the meaning of the words "and transacting or conducting any kind of business in this State."* The issue as to the meaning of these words is precisely the same as it was in the case of *State* v. *Lancashire Ins. Co., supra.* The words themselves are the same, used in the same connection, and the added

words, in other connections, in no manner change the sense in which these are used.

That this is true is shown by the pleadings in the two cases, and the contention of counsel for the State in each case. In the case of the *State* v. *Lancashire Ins. Co.,* counsel for the State, in presenting the issue as to the proper meaning of these words, "and transacting or conducting any kind of business in this State," said: "The conjoint act of being a member of a pool or trust and the doing of business in Arkansas constitutes the gist of the offense. One cannot be separated from the other. But it is when the conjoint act is consummated by the appellees that the sting of the law attaches, and they are prohibited from coming into our borders for the purpose of carrying on their nefarious business." And again: "The matter upon which the sting of the law is placed consists in the two concurring elements: (1) Participating in an agreement to regulate or fix prices or rates; and (2) at the same time, or in reference thereto, doing business in the State." (Brief of Attorney General in former cases.)

In the present case counsel for the State say: "What reason can there be for holding that the act makes either membership in a pool alone, or doing business in itself, the gravamen or gist of the offense? Is it not a sensible and reasonable construction of the act that it takes both to constitute the offense?" We thus quote from the briefs of counsel to show that counsel in both cases understood and contended that the doing of business as set forth by the words "and transacting or conducting any kind of business in this State," as used in the statute, prescribed an essential element in the offense.

In answer to the contention of counsel on this issue in the Lancashire case, I said: "The proposition, when analyzed, is exceedingly simple. The Legislature has no extra-territorial power to punish crime. The crime specified in this act is the "entering into, becoming a member of, or a party to, any pool, etc., to fix or limit the prices or premiums to be paid for insuring property against loss or damage by fire," etc. If a foreign corporation, doing business in this State, enter into, or become a member of, this pool or trust beyond the limits of the State, then the crime is clearly committed beyond the limits of the State, unless the pool or trust is to fix the premiums for insuring property in Ar-

kansas, in which event the crime put in motion in the foreign State takes effect and becomes complete in Arkansas. Just as in the cases cited by the Attorney-General, where a man in one State throws a stone, or shoots a gun across the line, and kills a man in another State, or forms a conspiracy in one State to burn or destroy property in another State, the crime in such cases becomes complete where the person is killed or where the property is dstroyed. But where the foreign corporation enters into, and becomes a member of, a pool or trust in a foreign State which does not purport to, and does not in any manner, affect the property of the people of the State, of course no crime is committed in this State.

"The Legislature certainly did not intend to make a crime, and punish the mere act of doing business in this State by a foreign insurance company, although a member of a pool or trust, whether in or out of the State; for the very gravamen of the crime is *entering a pool or trust to fix the price or premium* to be paid for insuring property, etc. Now, suppose the member of the pool or trust in the foreign State proposed to do business, and did business in Arkansas on a strictly competitive basis, which tended to cheapen and lower the rates of insurance to the people of this State, could any dispassionate lawyer say that the Legislature intended by this act to punish such a beneficial and commendable deed as that? Certainly not. The Legislature manifestly was intending to correct an evil existing which affects, or might affect, injuriously the people of the State. Now, the prohibiting of foreign corporations from doing business in this State on any terms and conditions that the Legislature may prescribe is one thing, and the punishing of them for any crime they may commit is another and entirely different thing. As to the former—the privilege to do business—the Legislature has the power to say: 'Foreign corporations, you cannot do business in this State, if you are a member of a pool or trust to fix or limit prices anywhere in the wide world.' As to the latter—the entering of a pool or trust, the crime—they could say: 'You will be punished with the severe penalties denounced by this act, if you are a member of a pool or trust to fix the price or premium upon property in Arkansas.'

"As the Legislature had no power to punish foreign corporations for becoming members of a pool or trust outside of the

State, which did not propose to affect prices in the State, and as it did have full power to punish them for entering pools or trusts to affect prices or premiums in Arkansas, and also to forfeit their right to do business in this State, is it not conclusive that they intended by the words 'any pool or trust' to mean any pool or trust to fix the price or premium on property in this State? We must not convict the Legislature of doing or attempting to do a vain and idle thing. Had the Legislature intended to exclude foreign corporations that were members of a pool or trust any-where in the world to fix prices anywhere outside of this State, how easy it would have been to have made it unlawful for such corporations to do business in this State, and to have provided sufficient penalties for the violation of such law to secure its enforcement. But no such thing as that was provided in the act under consideration. The purpose of the Legislature is doubtless correctly reflected in the title: 'An act providing for the punishment of pools, trusts and conspiracies to control prices, etc.' The fact that the Legislature embraced the other persons named in the act along with foreign corporations shows that it intended that these corporations might be considered as violating the law in the same way as any 'partnership or individual or any other association or persons whatsoever' might do. It is an egregious mistake to suppose that a foreign corporation is guilty of an offense for merely doing business in this State, or to consider the act of doing business as an element of the offense under this law. It would be no more an offense for them to do business than for domestic corporations or individuals to do business. Foreign corporations are expressly authorized to do business. The doing of business by them is not an ingredient of the offense at all. The words, 'and transacting or conducting any kind of business in this State,' applied to them, are used in the sense merely of *descriptio personarum.* They merely indicate that these corporations are within the legislative jurisdiction because of the fact of their doing business in this State. There are no separate acts conjoined, as the Attorney-General supposes and argues, but the one act. The proof which would establish the crime would also establish the forfeiture of the right to do business in the State. The Legislature could both forfeit the right of the insurance company to do business and punish for the crime

of entering a pool or trust to fix the price or premium, if the act was done, or became complete or effectual, in Arkansas, but it could not punish for the crime unless it did. Therefore the fact that the Legislature has included individuals and domestic corporations, and has prescribed, as a result of the violation of this act, both a penalty for the crime committed and a forfeiture of the right to do business, shows conclusively that, as to foreign corporations, it could only have intended to reach such of these corporatins as were in a pool or trust in this State, or in a foreign State, to regulate prices in this State."

The Legislature, having adopted these words, must be held to have adopted them with the construction that was placed upon them by the judges of this court, and as to the proper construction to be given these words there was no difference of opinion among the judges of the court as then constituted. It will not do now to say this question was then not presented, and that what I then said was *obiter dicta.* For that is not true, as shown by the pleadings and the contention of respective counsel in the case. As the Legislature has not indicated by anything they have said in the present act that they intended that the meaning of these words should be different from what we held them to mean in the Rector law, I do not feel called upon to change my views. I concur fully with Judge BATTLE as to the meaning of these words. Suppose we had a law saying: "Any Attorney-General, Governor or Secretary of State, living in Little Rock, and transacting and conducting any kind of business in the west wing of the Capitol, who shall enter or become a member of any trust in this State or elsewhere to fix prices, etc., in this State or elsewhere, etc., shall be deemed and adjudged guilty of a conspiracy to defraud." Could any one say that the words "living in Little Rock, and transacting or conducting any kind of business in the west wing of the Capitol" were elements of the offense? Certainly not. Yet there would be just as much reason and sense in saying that these words were elements of the offense in the case supposed, as to say that the words "and transacting or conducting any kind of business in this State" are elements of the offense in the present law.

Second. As to the proper meaning of the first section, it will be observed that the words "in this State or elsewhere," are

added after the word "made," referring to the trust agreement, and that the words "either in this State or elsewhere" are also added after the words "to regulate or fix," etc., and the words "to fix or limit," etc. Taking the words in the connection used, and giving to each word its grammatical construction and natural meaning, the construction would be that the words "in this State or elsewhere," where they first occur, after the verb *made,* constitute an adverbial phrase, and modify that verb; making the language refer to a "pool, trust," etc., *made anywhere,* and that the words, "in this State or elsewhere," after the verbs to "regulate or fix" and "to fix and limit," likewise constitute an adverbial phrase qualifying these verbs. So that the meaning of this section is, that if any domestic corporation which is a going concern in this State, or any foreign corporation that is transacting or conducting any kind of business here, or any of the other classes of persons named in the act, shall *enter into* any trust *anywhere in the world to fix prices,* and shall proceed to fix the prices or premiums anywhere in the world, or to limit or regulate anywhere in the world the quantity or amount of any article of property in this State, or to be used and which is used in this State, all such classes named in the act are then guilty of a *conspiracy to defraud,* as declared therein, and thereby subject to the penalties denounced against such in the second and third sections for a violation of the provisions of the act.

It will be noticed that the qualifying phrase, "in this State or elsewhere," is not used after the words "property" or "article or things." If this phrase had been used after these words, then it would have been an adjective phrase, qualifying the nouns "property" or "article" or "thing" anywhere in the world. But, as the Legislature has not said that the "property" or "article" or "thing" upon which the premium is paid or of which the quantity is limited or fixed may be elsewhere, we must presume that this was for the reason that they did not intend for the act to have an extra-territorial effect, which would have been beyond their jurisdiction. In *State* v. *Lancashire Ins. Co., supra,* Judge RIDDICK said: "Our conclusion is that this statute does not apply to pools or combinations formed outside of this State, and not intended to affect prices in this State. In other words, we are of the opinion, that the Legislature by this act did not intend to

prohibit or punish acts done or agreements made in foreign countries by corporations doing business here when such acts or agreements have reference only to persons or property or prices in such foreign countries." So it cannot be said that the court expressly decided that the Rector law was applicable to trusts formed outside of the State which were intended to affect persons, property or prices of insurance in this State.

Judge Martin, the learned circuit judge who decided the Lancashire case, and many eminent counsel held to the view, under the Rector law, that, according to the strict construction to be given criminal statutes, the trust agreement itself would have to be made in this State before the law was violated. Now, the Legislature, having taken up the whole subject of anti-trust legislation anew in the act of 1905, determined to make it plain that no matter where the trust was formed or the prices fixed, if such trust affected in any manner persons or property in this State, the crime was complete. Hence they added the words "in this State or elsewhere." The Rector law is expressly repealed. The first section of that law was substantially re-enacted with the slight additions to make clear the purpose which I have here indicated. The second, third, fourth, fifth and sixth sections of that law were re-enacted exactly as in the Rector law, but the fourth, fifth, sixth, eighth and ninth sections of the present law are not embraced in the Rector law at all, showing that the Legislature was intending to make an entirely new law upon the subject.

Third. The court treats the act as a criminal statute, and not as an act simply prescribing conditions upon which foreign corporations may do business in this State. When so treated, the construction given by the court, in my opinion, would render the whole of the first section unconstitutional. For a foreign corporation, having complied with our laws, and already doing business in this State, must be treated, under our Constitution and statutes, so far as the punishment for criminal offenses is concerned, exactly as domestic corporations or other persons are treated. Constitution. art. 12, § 11; Kirby's Digest, §§ 824, 828. And who would be so bold as to declare that it is within the power of the Legislature to punish individuals, or any member of any partnership, association or company, or even domestic corporations for the mere innocent act of doing business in this State,

because such persons might be interested in trusts elsewhere, to affect prices elsewhere, but which acts were perfectly lawful in the States where they were done? Could one of our domestic corporations, or one of our own citizens, or a citizen of another State who owned stock in a corporation or company in another State, which was in the insurance business, for instance, which corporation or company in another State was in a trust not forbidden by the law of the State—could such individual or domestic corporation be punished in this State under this law for selling shoes, groceries or dry goods, when such sales were without any reference whatever to the trust of which he was a member in other States? Clearly not, for such a monstrous doctrine would be contrary to art. 2, § 2, of the declaration of rights in our Constitution, securing to "all men" the "inalienable right" of "defending liberty" and "of acquiring, possessing and protecting property;" also section 17 of the same article, forbidding the passing of any law impairing the obligation of contracts. Upon this question Judge RIDDICK has well said; "Now, while the Legislature can dictate the terms under which corporations of other States may do business here, it does not have control of the citizen. If a merchant of Missouri, doing business also in this State, should enter into a pool or combination in Missouri to regulate prices there, but not intended to have effect in this State, our Legislature could not on that account prevent him from doing business here, or subject him to a penalty. So, if we adopt the construction contended for by the Attorney-General, we must assume, as to a portion of the statute, that the Legislature was attempting to do something it plainly had no right to do, and such portion must be treated as unconstitutional and void."

The Legislature certainly did not intend for the act to have the effect that it must have on other classes named in the statute, if the construction of the majority is correct as to foreign corporations. The Supreme Court of the United States says: "Our duty, therefore, is to adopt that construction which, without doing violence to the fair meaning of the words used, brings the statute into harmony with the provisions of the Constitution. * * * Such construction shall be given to it as will render it free from constitutional objection. It ought never to be assumed that the law-making power of the government intended to usurp or as-

sume power prohibited to it." *Grenada County* v. *Bragden,* 112 U. S. 269.

This act does not seem to be framed as an exclusion statute, or as prescribing the conditions upon which foreign corporations might be permitted to do business in this State. If the first section had been presented in that light, without any reference to penalties for some crime committed, then, taken in connection with the third section forfeiting the right to do business, I would have had more doubt as to its invalidity. Presented as a criminal statute to punish a foreign corporation for some act done beyond the borders of the State, and which in no manner affects persons or property in the State, I have no doubt whatever of its unconstitutionality. No statute should be given an extra-territorial effect if it can be avoided. Black, Int. Laws, pp. 91 *et seq.*; Endlich, Con. and Int. Stat. §§ 169, 170, 335; Bishop, Stat. Crimes, §141, and many authorities cited.

Treated as a criminal statute, the Supreme Courts of Texas and Missouri have already declared § 7 unconstitutional.

But I have already extended this opinion farther than I intended. As I construe the law, it might have subserved a useful purpose in giving the people some relief from those unlawful combinations in restraint of trade called trusts, which, when intended to suppress competition in prices and thus oppress the people, are wicked and harmful in the extreme. The law should severely denounce and punish these to the extent of driving them from our State, if possible.

But the law, as construed by the majority, will not have that effect. On the contrary, it will rather tend to build up and foster the most gigantic and oppressive of the trusts, by preventing free competition, the very thing which wise anti-trust laws are enacted to encourage. As construed by the court, it will undoubtedly drive nearly all the old line insurance companies from the State, but that will have the effect of raising, instead of lowering, the price of insurance; and, if enforced in other respects, will open up a veritable Pandora's box of ills to the commercial and business interests of the State, which will hurt thousands and help none.

For these reasons, I do not believe the Legislature intended the act to have the effect which the majority of the court con-

strue it to have; and if they did so intend, they have wholly failed to express such intent in the language of the act. That the Legislature knew how to make an act unlawful when they intended it to be so is shown in sections four, five and six, where they expressly make the *doing of certain things named therein unlawful.* But they use no such language with reference to the *"transacting or conducting of business"* in the first section, or anywhere else, which this court now supplies to make a crime out of what has always been considered not only as innocent but helpful to all, to-wit, the doing of business, not under a trust, but in free competition with all. I submit, with due respect to my associates, that they are wrong, and this wrong, having received the final sanction of this tribunal, the last refuge of the litigant for right and justice. can never be corrected.